**Larry J. McCLINTON, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**Nos. 92–CF–938, 01–CO–681.**

District of Columbia Court of Appeals.

Argued April 16, 2002.

Decided March 6, 2003.

---

Douglas Wham, Washington, DC, appointed by the court, for appellant.

Lisa Hertzer Schertler, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish Jr., and L. Jackson Thomas II, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, REID and WASHINGTON, Associate Judges.

REID, Associate Judge:

The central issue in this appeal is whether the trial court violated appellant Larry J. McClinton's Sixth Amendment constitutional right to counsel by permitting him, more than halfway through his trial, to represent himself, with the assistance of standby counsel, without making a proper inquiry on the record as to whether appellant's waiver of counsel was knowing, intelligent and voluntary. We hold that on the whole record before us, the trial court erred by not conducting an adequate inquiry with regard to Mr. McClinton's waiver of his right to counsel. However, since the trial court's error did not pervade the entire criminal proceeding against him and his standby counsel in effect functioned as his attorney, automatic reversal of his convictions is not required. Furthermore, under the applicable constitutional harmless error rule, we conclude that the trial court's error was harmless beyond a reasonable doubt. Discerning no other trial court errors, we affirm its judgment.

## FACTUAL BACKGROUND

In July 1990, Anthony Morrisey was murdered in the Southeast quadrant of the District of Columbia. Approximately six months later, Mr. McClinton, and four other persons, were indicted on multiple criminal counts, including conspiracy to possess with intent to distribute cocaine; conspiracy to commit extortion; kidnaping while armed; extortion while armed; first-degree murder while armed (felony murder); carrying a pistol without a license; and possession of a firearm during a crime of violence.[1] A jury convicted Mr. McClinton on these seven counts.[2]

The record before us shows that when the alleged crimes were committed, Mr. McClinton was in his late teens, had an infant daughter, and had not completed high school.[3] His juvenile records in the District reflected three prior charges in 1986 and 1988, two of which related to unauthorized use of vehicles in which he was a passenger. The third District juvenile offense pertained to a drug charge; he was placed on probation for one year. He was charged with robbery with a dangerous weapon in Montgomery County, Maryland in 1987, treated as an adult, and

---

1. The four others indicted with Mr. McClinton were Levi L. Hill, David (a/k/a Damo) M. Long, Reginald Douglas, Jr. and Darrell A. Salters. Mr. Hill was acquitted on November 19, 1991, after a separate trial; and charges against the other three were dropped on March 5, 1992.

2. Mr. McClinton was sentenced to: 10 to 30 years on count one, conspiracy to possess with intent to distribute cocaine; consecutive to count one, 10 to 30 years on count three, kidnaping while armed; 20 months to 60 months on count two, conspiracy to commit extortion; concurrent to count two but consecutive to count one, 5 to 15 years on count four, extortion while armed; consecutive to the prior counts, 20 to 45 years on count five, felony murder; consecutive to the prior counts, 5 to 15 years on count seven, possession of a firearm during a crime of violence or dangerous offense; and concurrent to count seven, 1 year on count six, carrying a pistol without a license.

3. According to his trial testimony, Mr. McClinton completed the 11th grade.

sentenced to five years, with all but six months suspended, and placed on probation for five years.

At trial, the government presented evidence revealing that Mr. Morrisey and Mr. Derek Covington were partners in a drug-dealing operation. On July 11, 1990, Mr. Covington and another person purchased cocaine in New York for $3,000, and were scheduled to deliver the substance to Mr. Morrisey upon their return to the District of Columbia. Mr. Morrisey did not appear at the appointed time and place, and failed to respond to a page. Later, a message was received that Mr. Morrisey was being held for a ransom of $20,000 and half a kilogram of cocaine. Mr. Covington contacted Mr. Morrisey's father who called the police.

Working through the police, Mr. Covington arranged for the delivery of the ransom demands by Mr. Morrisey's father. A detective stood in for Mr. Morrisey and attempted to make the delivery. Although two men approached the delivery bag, which was left on a playground, they did not retrieve it. A little later, Mr. Morrisey's body was found. He had been shot four times.

During trial, the government played a videotaped statement given by Mr. McClinton. He recounted how Mr. Douglas, Mr. Hill, and Damo Long had flagged him down while he was driving with his younger cousin. Mr. McClinton agreed to pick up some cocaine and went to Mr. Douglas' house around 11 p.m. on July 11, 1990, where he saw Messers Morrisey, Douglas, Long and Hill. All of the men got into Mr. McClinton's station wagon. Mr. Douglas had a gun, but Mr. McClinton did not suspect that Mr. Morrisey was being held captive. Mr. Douglas and Mr. Long got out of the station wagon a couple of times to make telephone calls. Later, Mr. Douglas, Mr. Long and Mr. Morrisey were

dropped at Mr. Long's home, and Mr. McClinton and Mr. Hill were instructed to go to the playground at Evans Junior High School to make a pick-up. Because Mr. McClinton was scared to get the cocaine, he and Mr. Hill recruited two other persons to pick up the cocaine. All four persons went to the junior high school; and the two recruits went to get the package, but retreated when they saw someone running toward them. Mr. McClinton saw helicopters and a flashing light. He left the area and called Mr. Douglas to inform him that police were all around. Approximately five minutes later, Mr. McClinton heard two gunshots, drove away, and stopped when Mr. Douglas flagged him down and jumped into his station wagon. Mr. Douglas told Mr. McClinton and the others that he had killed Mr. Morrisey.

## ANALYSIS

*The Sixth Amendment Right To Counsel Issue*

Mr. McClinton argues that his Sixth Amendment constitutional right to counsel was violated when the trial court permitted him to represent himself, after the defense had begun its case, without ascertaining whether he made a knowing, voluntary and intelligent waiver of counsel. The government takes the position that Mr. McClinton "knowingly and intelligently chose self-representation," and argues that he was assisted by standby counsel.

■ A criminal defendant has a fundamental right to the assistance of counsel since "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant." *Leak v. United States*, 757 A.2d 739, 745 (D.C.2000). Although the notion of self-representation is not stated explicitly in the Sixth Amendment, the Supreme Court of the United States has declared that the

Sixth Amendment "grants to the accused personally the right to make his defense." *Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In *Ali v. United States,* 581 A.2d 368 (D.C.1990), we summarized the Supreme Court's cautionary statements, articulated in *Faretta, supra,* concerning self-representation, as well as the procedure for determining the validity of a defendant's waiver of the right to be represented by counsel:

> When an accused manages his own defense, he relinquishes ... many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. *Johnson v. Zerbst,* 304 U.S. [458], 464–465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1988).... Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Adams v. United States ex rel. McCann,* 317 U.S. [269], 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

*Ali, supra,* 581 A.2d at 371–72 (quoting *Faretta, supra,* 422 U.S. at 835, 95 S.Ct. 2525). We also reiterated in *Ali* our reliance in *Hsu v. United States,* 392 A.2d 972 (D.C.1978), on Supreme Court Justice Black's " 'script' " to be followed when a defendant decides to waive his Sixth Amendment right to counsel:

> To be [made] valid such waiver [of counsel] must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereun-

der, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandably and wisely made only from a penetrating and comprehensive examination of all the circumstances....

*Id.* at 372 (quoting *Hsu, supra,* 392 A.2d at 983) (quoting *Von Moltke v. Gillies,* 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948) (plurality opinion)).

We first set the factual context for our analysis of Mr. McClinton's Sixth Amendment argument. During his trial in 1992, Mr. McClinton was represented by court appointed counsel. He and his defense counsel disagreed about trial strategy, particularly whether Mr. Levi Hill would be called as a witness, and whether Mr. McClinton would testify. After the government had completed presentation of its case-in-chief, and Mr. McClinton's motion for judgment of acquittal had been denied, defense counsel advised the trial judge that before he made his opening statement, the court might want to inquire of Mr. McClinton whether he intended to take the stand. Defense counsel also indicated that he would not call Mr. Hill as a witness, but would ask the judge to take judicial notice of the fact that Mr. Hill was an alleged co-conspirator who was tried and acquitted of all charges. Furthermore, defense counsel suggested that because of the conflict between client and counsel, the court might want to make a limited *Monroe–Farrell*[4] inquiry to determine Mr. McClinton's difficulties with his counsel.

The trial judge excused the jury and proceeded with the *Monroe–Farrell* inqui-

---

4. *Monroe v. United States,* 389 A.2d 811 (D.C.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *Farrell v. United States,* 391 A.2d 755 (D.C.1978).

ry, initially telling Mr. McClinton: "[C]ounsel has said that you have voiced some dissatisfaction about his representation of you. I would like to know specifically what your problem is." Mr. McClinton responded: "We don't get along." When the trial judge asked for more specificity, Mr. McClinton explained: "He has been telling me to do things that I don't want to do .... Telling me to work with the government .... We don't get along. We fuss, we fuss a lot. He fuss (sic) with me and my family." The trial judge did not "find [Mr. McClinton's statements to be] specific enough," and thus took no action, allowing defense counsel's representation to continue. The judge then explained what would happen if Mr. McClinton decided not to take the stand, and alternatively, if he testified. At the end of the explanation, and without further consultation with defense counsel, Mr. McClinton said: "I am taking the stand."

The defense case proceeded. Defense counsel gave his opening statement and presented two defense witnesses. One witness stated that her close friend (who testified as a government witness) admitted shooting the victim; the other witness, who had known Mr. McClinton for five years, stated that on July 11 and 12, 1990, she was at a residence near the site where the decedent's body was found, and that while she saw Messers Douglas, Long, Hill and Salters there, she did not see Mr. McClinton.

Following testimony by the first two defense witnesses, defense counsel informed the trial judge that Mr. McClinton had asked for a recess, and declared: "I have been directed to call Levi Hill as a witness, and I am anxious to make a record of the fact that I simply cannot do that." Defense counsel stated that Mr. McClinton would be the last defense witness, and that he wanted "the stipulation or whatever it is going to be with respect to Levi Hill's acquittal." Government counsel opted for judicial notice of Mr. Hill's acquittal, rather than a stipulation.

Mr. McClinton then asked to address the court. He briefly explained that he "wanted ... to call Mr. Hill to verify the tape I am saying is false...." [5] The prosecutor advised that: "Mr. Hill has expressed his unwillingness to cooperate with [defense counsel]. He has spoken with me and does not want to participate in this trial if he can avoid it. I'm not saying that he can avoid it...." The judge noted that Mr. Hill had come to court voluntarily and that a bench warrant was not necessary.

The next day, which was the fourth day of trial, counsel for Mr. McClinton informed the trial judge that: "[T]he attorney/client relationship [between defense counsel and Mr. McClinton] was growing strained yesterday, and today I am informed it is completely ruptured." Defense counsel asserted that neither Mr. McClinton nor Mr. McClinton's mother had confidence in counsel, and in fact, thought he was in a conspiracy to "sell out the defense." Defense counsel requested a mistrial, emphasizing Mr. McClinton's right to counsel, asked permission to withdraw from the case, and requested the appointment of another counsel for Mr. McClinton. The prosecutor opposed the motion and pointed out that earlier in the case Mr. McClinton had expressed dissatisfaction with his lawyer and that his counsel had moved to withdraw from the case, but that when asked for his views by an-

---

**5.** Mr. McClinton gave a videotaped statement to the police on March 19, 1991. He maintained that the statement was false and he was pressured into saying what the police wanted to hear.

other judge, Mr. McClinton "said that he didn't have a problem with his lawyer, and he was satisfied with him."[6] Defense counsel responded, in part, by expressing his inability to make "sound, good decisions" in Mr. McClinton's behalf. Nonetheless, he indicated his willingness to continue with the representation and to call Mr. Hill as a witness for the defense.

Following additional discussion with both defense and government counsel, the trial judge refused to grant a mistrial or to allow defense counsel to withdraw, because he saw no reason for doing so. The judge regarded defendant's efforts to get his counsel to withdraw as "just a ploy to stall for time, to probably stall to get another jury." He stressed that: "This jury has heard this case for almost a week. They have heard a lot of testimony, and I have been very indulgent with recesses...." Consequently, the trial judge told defense counsel that Mr. McClinton had two options:

> If he wants, he can represent himself for the rest of the trial, but [defense counsel] will have to sit there, and if he wants any advice, he is going to have to turn to you, and, like an attorney, you are going to have to give it to him. The other choice is he can continue to have you as his attorney, but if he does, you make the decisions as an attorney.

The trial judge reiterated that if defense counsel continued to represent Mr. McClinton, defense counsel would be "in control of the case, [Mr. McClinton] is not in control of the case." Mr. McClinton asked for a recess to confer with defense counsel. The trial judge allowed "10 minutes" for the conference, and instructed defense counsel to "[r]emind [his client that] there are a lot of people in Lorton who have represented themselves."

Defense counsel conferred with Mr. McClinton and then announced that Mr. McClinton had decided to represent himself. Defense counsel cautioned, however, that "Mr. McClinton may be panicked and may not be thinking clearly." Hence, he requested that the court recess the trial until the following day to give counsel a chance to "remedy the relationship" with Mr. McClinton; and to provide Mr. McClinton an opportunity to "think through precisely where he is going." In addition, defense counsel advised the court that he was "not familiar with what specific questions ... the trial judge might be obliged to ask of Mr. McClinton as he moves forward to represent himself." Government counsel offered to research the matter on his computer to determine "any case law that is controlling," and added: "I would think that all we are required to do is make sure he intelligently and voluntarily waives his right to counsel." Defense counsel inquired of the court: "Is it a permanent replacement of counsel as [Mr. McClinton] moves to represent himself, or can I come back in after closing argument if, in fact, he realizes having tried to represent himself that things didn't go as expected?" The trial judge responded:

> it became clear to me that Larry McClinton doesn't get along with anybody. He is a person who wants to yell and scream at people. That characterized our discussions yesterday, and that was, in fact, what terminated our discussions yesterday." The prosecutor also discussed the matter with Mr. McClinton's parents and asserted that they favored the negotiating meeting.

---

**6.** During the course of the trial, and outside the courtroom, the government had been making efforts to negotiate a plea bargain with Mr. McClinton. Government counsel referenced these negotiations, and conveyed his opinion of Mr. McClinton, during his opposition to defense counsel's effort to withdraw from representation of Mr. McClinton. The prosecutor stated, in part: "Yesterday I had a discussion with Mr. McClinton in which

[I]f he wants to represent himself ...,
you are still going to be required by the
Court to sit there and be available to
assist him, and if part of that assistance
is he wants you to make a closing argu-
ment -

The prosecutor interrupted the judge, say-
ing that he had no objection to defense
counsel doing the closing argument.

The trial judge decided to proceed be-
cause "this jury has been sitting all week,
and we have taken many recesses to ac-
commodate the defendant and his whims
and wiles." The judge indicated that he
would "tell [Mr. McClinton] he has a right
to represent himself and ..., if a person
chooses to represent himself, he will be
held to the same standard as a lawyer."
Government counsel again offered to do a
computer search "[i]f there is any question
about the colloquy that the Court should
engage in ...." The judge responded:
"No, the jury is waiting for a while." The
court took a brief recess.

After the recess, and outside of the
presence of the jury, the trial judge asked
Mr. McClinton to approach the bench,
and stated: "The posture of this case is
Mr. McClinton has decided to represent
himself." Defense counsel asked Mr.
McClinton if the trial judge's statement
was correct, and he responded "Yes." The
following exchange then took place be-
tween the trial judge and Mr. McClinton:

THE COURT: I am going to have [de-
fense counsel] sit with you and be
available in case you want to consult
with him or get advice from him. It's
entirely up to you. Anything you
want him to do as your attorney, he's
going to do.

THE DEFENDANT: Yes, Your Honor.

THE COURT: You will be representing
yourself, and the law in this jurisdic-
tion, in case you don't know it, ... [is]
when an individual does represent
himself, they are held to the same
standards as an attorney. Do you
understand that?

THE DEFENDANT: Yes, sir.

There was no colloquy respecting the waiv-
er of counsel. The trial judge thereafter
turned his attention to Mr. Hill and the
Fifth Amendment issue.

As the case proceeded, counsel for Mr.
Hill advised the court that Mr. Hill would
invoke the Fifth Amendment because he
might say something constituting perjury.
He also summarized what Mr. Hill would
say: "Mr. Hill has no testimony that would
be relevant to this trial because it would be
his position that he never saw Mr. McClin-
ton that night [i.e., July 11–12, 1990]."
The prosecutor retorted: "If Mr. Hill took
that position, then Mr. Hill gave a state-
ment which he signed and which he would
be impeached with." The trial judge en-
gaged counsel in discussion about the invo-
cation of the Fifth Amendment privilege.[7]

---

7. At one point during the discussion, Mr.
McClinton declared: "I wanted to raise an
issue." The prosecutor, counsel for Mr. Hill
and defense counsel continued to talk, ignor-
ing Mr. McClinton. Eventually, Mr. McClin-
ton repeated why he wanted to have Mr. Hill
testify—essentially to state that neither man
knew the other, and that Mr. Hill could estab-
lish that the statement Mr. McClinton gave to
the police was false. The discussion contin-
ued and included defense counsel's sugges-
tion that the government could grant immuni-
ty to Mr. Hill "in the interests of justice for

Mr. McClinton." The prosecutor responded
that he did not think he had "a duty to go
back to [his] supervisors and present every
offer that is given"; and that the government
would not give Mr. Hill immunity. Moreover,
if he perjured himself during testimony at Mr.
McClinton's trial, "the United States would
pursue him to the ends of the earth." At that
point, the trial judge said to Mr. McClinton:
"That's it. You know the rules right now."
Mr. McClinton responded:

Yes, I am getting a picture of the solution
[the prosecutor] is talking about, but I don't

Following a short recess, the court permitted Mr. McClinton to question Mr. Hill without the presence of the jury to determine the propriety of Mr. Hill's assertion of the Fifth Amendment privilege against self-incrimination. Mr. McClinton posed numerous questions to Mr. Hill. Although Mr. Hill invoked the Fifth Amendment in response to most of the questions, he was ordered to answer most of them when the prosecutor stated that invocation of the privilege was not proper and the trial judge agreed. When Mr. McClinton sought to refresh Mr. Hill's recollection as to the events of July 11 and 12, 1990, with a statement Mr. Hill gave to the police on July 18, 1990, Mr. Hill maintained that he could not read the statement.

Mr. McClinton asked how Mr. Hill could give a statement if he did not read it, and Mr. Hill invoked the Fifth Amendment. Defense counsel, and initially the prosecutor, expressed the view that Mr. Hill's answer would not be incriminating. The prosecutor changed his mind when counsel for Mr. Hill told the trial judge that, "how that statement was given, whether he was able to read it after it was typed by the detective," was a "central issue ... at [Mr. Hill's] trial." Thus, he asserted, Mr. McClinton's line of questions went "squarely into the area of risk" for Mr. Hill. Although Mr. McClinton posed additional questions to him, Mr. Hill consistently invoked the Fifth Amendment, and the prosecutor objected to the follow-up questions. Ultimately, after the prosecu-

tor agreed that Mr. Hill would be exposed to a risk of self-incrimination, defense counsel disagreed, and Mr. McClinton posed several other questions, the trial judge ruled that Mr. Hill had a right to invoke the privilege.

The prosecutor cross-examined Mr. Hill, but neither the defendant nor defense counsel raised any objections to the prosecutor's questions. Despite Mr. Hill's invocation of the Fifth Amendment, the court ordered him to respond to questions establishing that while he had problems reading, he had none in writing his name. He identified his signature on a government exhibit.

The last defense witness was Mr. McClinton. He was questioned by defense counsel. He testified that a statement he gave to the police on July 19, 1990, was "[p]artially true, partially false." He described his interactions with the police on the day of his statement, referencing in particular a two to three and one half hour session during which the police prepared him for a videotaped statement by telling him what to say. Mr. McClinton in essence alleged that he was pressured into implicating others indicted with him, whom he feared, especially Reginald Douglas, Jr., and that he "got scared." He characterized his videotaped statement as "a false statement" in its entirety. Furthermore, Mr. McClinton denied knowing the murder victim, or being at the scene of the murder in July 1990, or being involved in a

---

think Mr. Hill will get up there and commit perjury. I feel for me he's not going to get up there and lie. I feel he will get up there and tell the truth of the matter.
The court answered: "Well, it's your throw of the dice. You made a decision to represent yourself. Remember, [defense counsel] is sitting there, and at any time you can ask him for advice." Defense counsel advised Mr. McClinton that he would "be in a position to object ... to [the prosecutor's] cross examina-

tion of Levi Hill, and ... [would] have full authority to object to [the prosecutor's] cross examination of [Mr. McClinton] in the course of [his] testimony if [he chose] ... to take the witness stand." The prosecutor said he had no objection to that procedure, or to any motion to strike a nonresponsive answer. When the trial judge asked Mr. McClinton if he "underst[oo]d that," he said: "Yes, I understand that."

conspiracy to extort money or drugs, or kidnaping. During intense cross-examination by the prosecutor, Mr. McClinton acknowledged that he had been charged with first-degree felony murder, but initially denied knowing that he was also indicted for kidnaping while armed. In addition, without initial objection by defense counsel, the prosecutor elicited an acknowledgment from Mr. McClinton that he had talked with the prosecutor on the previous day, and that the prosecutor had spoken with Mr. McClinton's mother and father. The prosecutor questioned Mr. McClinton in detail about his session with the police. Among other things, Mr. McClinton maintained that he was not allowed to make a telephone call until after he gave his statement to the police. When Mr. McClinton was impeached with a segment of the videotape showing that he asked to "use the phone one more time," defense counsel objected that that statement was not included in "the tape that was supplied to [him]." The government insisted that the statement was on the tape that had been admitted into evidence, and had been played for Mr. McClinton at the D.C. Jail. The trial court denied defense counsel's motion for a mistrial.

Mr. McClinton's efforts to call his mother as a witness failed. Without proffering the nature of the mother's testimony, defense counsel expressed the view that the testimony of the mother "may well be irrelevant." The trial judge directed defense counsel to inform Mr. McClinton of its rule on witnesses, since his mother had been present in the courtroom throughout the trial. When Mr. McClinton pointed out that Detective Smith had been in the courtroom during testimony even though he was a witness, the prosecutor stated that he had not planned to call the detective as a witness, decided to do so only after the detective had been accused of inappropriate behavior, and that he had

instructed the detective to leave the courtroom as soon as it became apparent that he would have to testify. The judge agreed with the prosecutor, and disallowed the testimony of Mr. McClinton's mother.

Mr. McClinton's attempt to call his grandmother to refute testimony of Detective Smith that he had spoken with the grandmother when he went to Mr. McClinton's place of residence, also failed. The trial judge impatiently admonished Mr. McClinton, saying: "I told you . . ., if you want to represent yourself, you are entitled to it, but you are held to the same standards as a lawyer. Right now I would say if you are going to call a witness, call a witness. We have to move ahead." Mr. McClinton responded: "No, I ain't calling anybody."

The government presented two rebuttal witnesses. During the direct testimony of Detective Victor Smith, defense counsel raised objections to questions posed by the prosecutor. Detective Smith interviewed Mr. McClinton the day after the shooting incident for approximately "55 minutes." Defense counsel interrupted the government's questioning of Detective Smith to raise an objection as to whether aspects of the rebuttal questioning were "proper." Ultimately, Detective Smith insisted that he did not instruct Mr. McClinton about what he should say during his statement of July 19, 1990. Mr. McClinton conducted the cross-examination without assistance from defense counsel.

The second government rebuttal witness was Detective Vernon Jones, the lead detective in the investigation of the kidnaping and murder of the victim. He detailed the procedures followed on July 19 when Mr. McClinton was questioned; denied telling him what to say; pressuring him; cursing at Mr. McClinton; or hitting him with anything. He permitted Mr. McClin-

ton to "ma[k]e several telephone calls ... before he made [his] statement, and after he completed the statement." Defense counsel posed objections on Mr. McClinton's behalf during the direct examination of Detective Jones, but Mr. McClinton handled the cross-examination without contribution by defense counsel. Closing argument for Mr. McClinton was made by defense counsel.

We turn now to an application of relevant legal principles to the factual circumstances of this case. We have not been presented previously with the precise circumstances now before us, where a defendant decides to represent himself more than halfway through trial, and the trial judge designates his trial counsel as "standby counsel" to assist him, and if Mr. McClinton so desired, to make the closing argument for the defense. We look mainly to legal principles articulated in this jurisdiction that may be helpful in resolving the issue before us, whether defendant knowingly, intelligently and voluntarily waived his Sixth Amendment right to counsel more than halfway through his trial on multiple felony charges.

■ *Ali* and *Hsu, supra,* articulate the major legal principles governing a valid waiver of the Sixth Amendment constitutional right to counsel. A defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Ali, supra,* 581 A.2d at 371–72 (internal quotation marks and citations omitted). In addition,

To be [made] valid [a] waiver [of counsel] must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and the circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.

*Id.* at 372 (quoting *Hsu, supra,* 392 A.2d at 983) (quoting *Von Moltke, supra,* 332 U.S. at 724, 68 S.Ct. 316). Application of these principles requires "a penetrating and comprehensive examination of all the circumstances." *Id.*

■ The record before us shows that the trial judge did not conduct "a penetrating and comprehensive examination of all the circumstances" in order to determine whether Mr. McClinton's waiver of his right to counsel was valid. After giving Mr. McClinton the option of representing himself, with his defense counsel providing advice; or continuing with defense counsel's representation with his defense counsel "in control" of the case and "mak[ing] the decisions as an attorney," the trial court allowed defendant and counsel to confer for only "10 minutes" to make a decision, and instructed defense counsel to "[r]emind [his client that] there are a lot of people in Lorton [the District's then correctional complex in Lorton, Virginia] who have represented themselves." [8] Although those seasoned in the criminal law might perceive this reminder as alerting Mr. McClinton to "the dangers and disadvantages of self-representation," *Ali, supra,* 581 A.2d at 371–72 (quoting *Faretta, supra,* 422 U.S. at 835, 95 S.Ct. 2525), the

---

8. The trial court's effort to convey a warning through defense counsel, with whom Mr. McClinton had indicated dissatisfaction, did not satisfy the *Ali/Faretta* requirement that a defendant "be made aware of the dangers and disadvantages of self-representation." As the

court said in *United States v. Davis,* 269 F.3d 514 (5th Cir.2001), "[t]he court's reliance on the warnings against self-representation given by [defense] counsel, whom [the defendant] no longer trusted, was not sufficient." *Id.* at 520 (footnote omitted).

record does not reflect that in choosing self-representation, Mr. McClinton at age 21, with an 11th grade education and no experience with the adult criminal justice system in the District of Columbia, knew "what he [was] doing and [that] his choice [was] made with eyes open." *Id.* Even when defense counsel informed the trial judge that "Mr. McClinton may be panicked and may not be thinking clearly" concerning his decision to represent himself, the trial judge pressed on, ignoring defense counsel's request for a recess until the following day so that he could "remedy [his] relationship" with Mr. McClinton and give Mr. McClinton an opportunity to "think through precisely where he is going." The judge also brushed aside more than one offer by the prosecutor to do quick research as to what was required legally if a defendant chose to represent himself.

Nor did the trial judge attempt to determine whether Mr. McClinton knew what was involved with self-representation, telling him only that he would be "held to the same standards as an attorney." Without elaborating further, the trial court asked if Mr. McClinton "underst[oo]d that," and said nothing further after Mr. McClinton responded, "Yes, sir." Consequently, there was no effort to determine whether Mr. McClinton was familiar with trial procedures, the rules of evidence, or the rules of the Superior Court.

The trial court's on-the-record inquiry with respect to the charges and lesser included charges against Mr. McClinton, as well as the allowable punishments and defenses relating to those charges also was deficient. Mr. McClinton was tried on seven felony counts, including two types of conspiracy, extortion, kidnaping while armed and felony murder. Nothing during the colloquy regarding his desire to represent himself showed that Mr. McClinton mentally grasped or understood these offenses, the defenses he could rely on, or the range of punishments to which he was exposed. Although Mr. McClinton had heard the first week of testimony in his case, during which reference was made to charges against him, nothing in the record indicates that he was aware of the nature of all the charges, the allowable punishments and the defenses that could be raised.[9]

The trial judge's preoccupation with what he saw as Mr. McClinton's "ploy to stall for more time ... [and for] another jury"; the undesirability of keeping the jury waiting; and his conviction that Mr. McClinton was represented by competent counsel (his second appointed counsel), undoubtedly prompted him to ignore the prosecutor's offer to do quick research to ascertain what Mr. McClinton must be asked to ensure a valid waiver of his Sixth Amendment right to counsel; and to forgo the "penetrating and comprehensive examination of all circumstances" required by *Ali* and *Hsu, supra.* What the Third Circuit said in *United States v. Stubbs,* 281 F.3d 109 (3d Cir.2002) is appropriate in this case: "While we can understand, and perhaps even sympathize, with the frustration and exasperation of the district court judge, even well-founded suspicions of intentional delay and manipulative tactics can provide no substitute for the inquiries necessary to protect a defendant's constitutional rights." *Id.* at 120, n. 6.

---

**9.** The Fourth Circuit usually looks to "educational background, age and general capabilities of an accused" as important factors in helping the court to ascertain "the ability of an accused to grasp, understand and decide...." *United States v. Gallop,* 838 F.2d 105, 110 (4th Cir.1988) (citation omitted).

■ Furthermore, this is not "'a compelling case of circumstantial evidence that [Mr. McClinton] knew what he ... was doing,'" such that the trial judge's failure to conduct an adequate waiver inquiry may be excused. *Fowler v. United States*, 411 A.2d 618, 623 (D.C.1980) (quoting *Hsu*, 392 A.2d at 983); *see also Abney v. United States*, 464 A.2d 106, 108 (D.C.1983). The record depicts Mr. McClinton as a 21-year-old young man with an 11th grade education at the time of his trial, who was facing a complex case, which could not be characterized by its "simplicity" as in *Abney, supra*, because it consisted of seven extremely serious felony charges—conspiracy to possess with intent to distribute cocaine, conspiracy to commit extortion, kidnaping while armed, extortion while armed, first-degree murder while armed (felony murder), carrying a pistol without a license, and possession of a firearm during a crime of violence.[10] At the time of his trial, Mr. McClinton had experience with the Superior Court only as a juvenile, and only on three occasions—two of which involved unauthorized use of a vehicle, and the other a drug charge. Although he had been convicted, as an adult at age 16, in Montgomery County, Maryland, for robbery with a dangerous weapon, it is not clear whether he was tried on that charge or entered a guilty plea. Even if that case was resolved after a jury or a bench trial, Mr. McClinton undoubtedly was too young, and not far enough along in his education, to appreciate the complexities of a trial. Thus, unlike the appellant in *Abney, supra*, he did not have "familiarity with the courts in precisely this kind of legal proceeding," *id.* at 109; and in contrast to the appellant in *Fowler, supra*, he did not "kn[o]w a substantial amount about criminal law," *id.* at 623. Significantly, he was not apprised about the rules of procedure or evidence which he was required to follow.[11] In short, the record does not demonstrate that Mr. McClinton "knew what he was doing," *Hsu, supra*, 392 A.2d at 983, with respect to the core functions of a defense counsel, such as cross-examination of government witnesses, and the determination of trial strategy, including how to overcome objections to testimony by defense witnesses such as Levi Hill. The trial judge's failure to conduct an adequate waiver inquiry was therefore constitutional error.

Having concluded that the trial court's inquiry into Mr. McClinton's waiver of his constitutional right to counsel did not meet the standards set forth in *Ali/Hsu* (applying *Faretta* and *Moltke*), nor those applied in *Fowler* and *Abney*, we must now determine whether our holding, that Mr. McClinton did not knowingly, intelligently and voluntarily waive his right to counsel requires automatic reversal of his convictions. Our answer to this question depends on whether the denial of counsel in this case constitutes a constitutional structural error.

Following oral argument in this matter, we issued an order permitting the parties to file supplemental briefs on the applicability of the harmless error rule in this type of case. The government argues in

10. The appellant in *United States v. Singleton*, 107 F.3d 1091 (4th Cir.1997), who fired his counsel on the second day of his trial and assumed self-representation, was a high school graduate, had worked as a successful architectural draftsman, and had started his own car washing and detailing business. He was tried for only one type of crime—armed robbery (20 counts).

11. In *Stubbs, supra*, the trial judge advised the defendant who opted for the right of self-representation: "[Y]ou are only entitled ... to represent yourself in accordance with the Rules of Criminal Procedure, the Rules of Evidence, and the Rules of Court as they pertain to this case ...." *Id.* 281 F.3d at 119.

its supplemental brief that the *Chapman* harmless error doctrine applies in this case. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (constitutional violation was harmless beyond a reasonable doubt). The error, if any, was harmless beyond a reasonable doubt, the government maintains, because it "occurred late in trial, and [its] capacity to cause prejudice was reduced, if not eliminated, by the continued active involvement of [Mr. McClinton's] standby counsel." Moreover, "from [Mr. McClinton's] videotaped statement alone, the jury had ample grounds on which to conclude that [he] was a willing and culpable participant in the scheme that resulted in the death of Anthony Morrisey."

Mr. McClinton contends in his supplemental brief that the harmless error rule "does not apply to a violation of the Sixth Amendment right to counsel, like the one in this case, which involves the denial of counsel at a critical stage of the proceeding and pervades and contaminates the entire criminal proceeding." In addition, Mr. McClinton maintains that even under the harmless error rule, reversal is required because of the obvious prejudice to him, as evidenced by his efforts to handle the Fifth Amendment issue relating to Mr. Hill, his failure to object to the government's rebuttal, his handling of the cross-examination of the government's rebuttal witnesses, and the limitations of his age and education at the time of trial.

■■■ We examine first whether the denial of the right to counsel is a structural error. "All structural errors are constitutional, but not all constitutional errors are structural." *Johnson v. United States,* 812 A.2d 234, 243 n. 14 (D.C.2002) (citing *Lyons v. United States,* 683 A.2d 1066, 1070–71 (D.C.1996) (en banc)). This distinction is a significant one. As we said in *Lyons, supra,* "the category of 'structural

defect' discussed in [*Arizona v.*] *Fulminante* [, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)] is limited to fundamental constitutional errors." *Lyons, supra,* 683 A.2d at 1071. With respect to the denial of a right to counsel, the Supreme Court in *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), set forth the standard for determining when the denial may be characterized as a fundamental constitutional error: "Sixth Amendment violations that pervade the entire proceeding" are fundamental because they "cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Id.* at 256, 108 S.Ct. 1792. Thus, "the determination of whether a Sixth Amendment violation requires automatic reversal turns on the extent to which the violation pervades the entire criminal proceeding." *United States v. Klat,* 332 U.S.App. D.C. 230, 235, 156 F.3d 1258, 1263 (1998), *aff'd following remand,* 341 U.S.App. D.C. 340, 213 F.3d 697 (2000).

Case law reveals examples of constitutional errors that are structural. For example, total deprivation of trial or appellate counsel, and conducting an arraignment in the absence of defense counsel fall into the structural constitutional error category. *See Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Penson v. Ohio,* 488 U.S. 75, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988); *White v. Maryland,* 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963). Permitting a case to be tried by a judge who is not impartial also is a constitutional error that is structural. *See Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). *Satterwhite, supra,* cites other examples of constitutional errors that "pervade[d] the entire proceeding," including *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d

426 (1978) (conflict of interest in representation throughout entire proceeding). *Satterwhite, supra,* 486 U.S. at 256, 108 S.Ct. 1792 (other citations omitted).

■ Here, the constitutional violation—the resulting denial of the right to counsel due to the absence of a waiver that was knowing, intelligent and voluntary—did not pervade the entire criminal proceeding against Mr. McClinton. Indeed he was represented by counsel during the pretrial proceedings and for most of his trial, that is, throughout the government's case-in-chief and during part of the defense case. Moreover, he had the benefit of standby counsel during the remainder of his trial. Although there have been criticisms of the role played by standby counsel, an attorney appointed to such a position can play a meaningful role in the representation of a defendant. *See* Anne Bowen Poulin, *The Role of Standby Counsel in Criminal Cases: In the Twilight Zone of the Criminal Justice System,* 75 N.Y.U. L. REV. 676 (2000). The record in this case reveals that standby counsel took an active, meaningful role in key aspects of the trial following Mr. McClinton's decision to represent himself. He participated in the discussion, with the trial judge, the prosecutor, and Mr. McClinton, as to whether Mr. Hill could invoke his Fifth Amendment privilege. He conducted the rather extensive and detailed direct examination of Mr. McClinton; made objections during the government's rebuttal case; and gave the closing argument for the defense. Thus, Mr. McClinton's case is unlike that of the appellant in *Hsu, supra,* who was without counsel throughout the pretrial and trial proceedings. It is also unlike the situation in *Stubbs, supra,* where halfway through the trial the defendant decided to represent himself with the assistance of standby counsel, but "the record submitted on appeal ... [did] not sug-gest that standby counsel played any part in aiding [the defendant] during the remainder of the trial...." *Id.* at 121. Rather, Mr. McClinton's case resembles more a case relied on by the government, *United States v. Oreye,* 263 F.3d 669 (7th Cir.2001), *cert. denied,* 535 U.S. 933, 122 S.Ct. 1308, 152 L.Ed.2d 218 (2002), where standby counsel "examined and cross-examined a number of the witnesses, participated actively in the instructions conference, raised issues and objections, and ... gave the closing argument ...." *Id.* at 671. In essence, as in *Oreye,* standby counsel for Mr. McClinton "was functionally counsel." *Id.* at 672.

■ Because Mr. McClinton was not totally deprived of counsel throughout the criminal proceeding against him, and since he had the benefit of active standby counsel, the trial court's error in conducting the waiver inquiry did not pervade his entire criminal proceeding, and consequently, automatic reversal of his convictions is not constitutionally mandated. Instead, we apply the standard articulated in *Chapman, supra,* to determine whether the resulting denial of the right to counsel, due to the absence of a knowing, intelligent and voluntary waiver by Mr. McClinton, was harmless beyond a reasonable doubt.

Mr. McClinton argues that the jury verdict would have been different had he not opted for self-representation because his counsel could have challenged Mr. Hill's assertion of the Fifth Amendment privilege against self-incrimination and cross-examined the government's rebuttal witnesses more effectively. The record before us shows, however, that standby counsel actively participated in the Fifth Amendment privilege discussion, and further, that both the prosecutor and the trial judge recognized that there were numerous questions posed by Mr. McClinton that Mr. Hill was required to answer. Even

when the questioning of Mr. Hill reached the point where the prosecutor and judge concluded that there was a risk of self-incrimination which could result in a perjury charge, standby counsel objected and argued that there was no such risk. Under these circumstances, and in light of case law confirming the risk of a perjury charge, see *United States v. Whittington*, 783 F.2d 1210, 1218 (5th Cir.1986), we cannot say that handling of the entire Fifth Amendment privilege inquiry by an attorney would have resulted in a ruling compelling Mr. Hill to answer all of the questions posed by Mr. McClinton. We note also that Mr. McClinton does not suggest any additional questions that counsel may have posed to produce a different decision by the trial judge.

Nor can we say that had counsel conducted the cross-examination of the rebuttal witnesses the jury would have believed Mr. McClinton's claim that his videotaped statement containing admissions was false and resulted from pressure and maltreatment by police detectives. Indeed, his assertion that the detectives would not permit him to make a telephone call until after he gave the statement they wanted to hear is refuted by his own videotaped request to "use the phone one more time," and jurors reasonably could credit the testimony of Detective Jones that he allowed Mr. McClinton to "ma[k]e several telephone calls ... before he made [his] statement, and after he completed the statement." Moreover, during the direct examination of the rebuttal witnesses, standby counsel raised objections in Mr. McClinton's defense. And, Mr. McClinton does not indicate what additional questions counsel could have posed in an effort to persuade the jurors to disbelieve the detectives. Moreover, counsel made the closing argument for the defense. In short, we are satisfied that the trial

court's inadequate waiver inquiry was harmless beyond a reasonable doubt.

■ We dispose of Mr. McClinton's remaining arguments summarily. He contends that he was denied his Sixth Amendment right to a public trial when the trial court closed the courtroom to spectators during part of a pretrial hearing on his motion to dismiss the indictment against him. The trial judge cleared the courtroom during the testimony of a government witness after observing her behavior and concluding that she was "obviously intimidated by the people in the courtroom." Upon questioning by the trial judge, the witness asserted that she was "scared" and that others had advised her to "take the Fifth [Amendment]."

■ "The right to a public trial is not absolute." *Kleinbart v. United States*, 388 A.2d 878, 882 (D.C.1978). *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) indicates that the right may be curtailed "by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 44, 104 S.Ct. 2210 (quoting *Press–Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)). Here, the trial judge temporarily closed the courtroom during a pretrial hearing on a motion to dismiss the indictment to avoid intimidation of one witness. Under the circumstances, we detect no violation of the right to a public trial.

■ We are also unpersuaded by appellant's assertion that the prosecutor's rebuttal argument was improper and prejudicial. The prosecutor responded to a closing argument made by standby counsel which he interpreted as an attempt by the defense to promote jury nullification. There was no immediate objection, although standby counsel later requested a

mistrial, which was denied. Considering "the gravity of the [alleged] impropriety, its relationship to the issue of guilt, ... and the strength of the government's case," central to which was the videotaped statement of Mr. McClinton, we see no reversible error. *See Bates v. United States,* 766 A.2d 500, 508 (D.C.2000) (citing *Freeman v. United States,* 689 A.2d 575, 584 (D.C.1997)); *Coleman v. United States,* 515 A.2d 439, 450 (D.C.1986).[12]

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

12. Mr. McClinton's argument that the government's use of perjured testimony by Detective Johnny St. Valentine Brown requires reversal of his conviction has been addressed and rejected previously by this court. *See Benton v. United States,* Nos. 99–CF–524, 01–CO–1279, 815 A.2d 371, 2003 D.C.App. Lexis 14 (D.C. 2003); *Whitley v. United States,* 783 A.2d 629 (D.C.2001).