USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 96-1856 CRAIG MARTIN, Petitioner, Appellant, v. LYNN BISSONETTE, ET AL., Respondents, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] _________________________ Before Selya, Circuit Judge, Aldrich and Cyr, Senior Circuit Judges. _________________________ Carol A. Donovan, Committee for Public Counsel Services, for appellant. James S. Liebman, Elaine R. Jones, George H. Kendall, and L. Song Richardson on combined brief for James S. Liebman and NAACP Legal Defense & Educational Fund, Inc., amici curiae. Ellyn H. Lazar, Assistant Attorney General, Commonwealth of Massachusetts, with whom Scott Harshbarger, Attorney General, was on brief, for appellees. _________________________ July 11, 1997 _________________________ REVISED OPINION _________________________ SELYA,  Circuit  Judge .   Petitioner-appellant Craig Martin, a state prisoner, sought habeas relief based on a claim that the state court's exclusion of his mother from the courtroom during part  of  the  testimony of a key prosecution witness deprived him of his Sixth Amendment right to a public trial. The United States District Court for the District of Massachusetts denied the writ. Martin appeals. As a preliminary matter, we must explore, for the first time in this circuit, the interrelationship between habeas petitions and the newly enacted Prison Litigation Reform Act of 1996 (PLRA). Once that expedition is finished, we address the merits of Martin's claim. In the end, we affirm the judgment of the district court. I. PROCEDURAL HISTORY On  May  7,  1991,  a  Barnstable County (Massachusetts) grand jury indicted Martin on charges of breaking and entering. See Mass. Gen. Laws ch. 266, S 18 (1990). Later that year, a petit jury  found  the petitioner guilty as charged, and the court imposed a substantial prison sentence. Martin's subsequent attempts to gain surcease in the state court system proved unavailing. See Commonwealth v. Martin, 653 N.E.2d 603 (Mass. App. Ct.), further rev. denied, 654 N.E.2d 1202 (Mass. 1995). On March 12, 1996, the petitioner applied for a writ of habeas corpus in the federal district court, see 28 U.S.C. S 2254 (1994), naming as respondents various state officials (who, for ease in reference, we call "the Commonwealth"). He premised the 2 application on a claim that the trial court's exclusion of his mother from the courtroom during part of the testimony of a key prosecution  witness deprived him of his Sixth Amendment right to a public trial. The district court, without much in the way of independent  elaboration, turned a deaf ear and thereafter denied a certificate of probable cause. We nonetheless granted a certificate of appealability. See 28 U.S.C.A. S 2253(c)(1) (West Supp. 1997). II. THE COURSE OF TRIAL To understand the petitioner's claim, we must rehearse his trial in the Barnstable Superior Court. We offer only a synopsis, confident that the reader who thirsts for additional detail can find it elsewhere. See Martin, 653 N.E.2d at 604-06. The  Commonwealth alleged that Martin and Niles Hinckley, his half-brother, broke into the office of the Yarmouth town dump and  stole  a  safe. After removing the safe from the building, they told  a  friend, Thomas Violette, that they needed help to transport "something  big."   Violette obliged. As the three men left the dump in Hinckley's car, with the safe aboard, they came across Linda Rose,  whose  automobile  had failed her. She joined them. The group proceeded to Rose's home. Once there, the men dragged the safe into the house and tried to open it. Unsettled by this endeavor, Rose  departed with her children. Violette also grew anxious about his involvement; he left the premises a few minutes after Martin and Hinckley began working on the safe, pondered his predicament, and then made a beeline for the police. The culprits were 3 apprehended and charged in short order. Martin and Hinckley were tried together. The Commonwealth called Rose as a witness in its case in chief. She stated repeatedly that she did not see (or, at least, could not recall) much of what had transpired on the evening in question. The  prosecutor told the judge at sidebar that Rose was nervous and scared and suggested that her professed lapses of memory were disingenuous. The trial adjourned in the midst of Rose's cross- examination. On the next trial day, the prosecutor voiced concern about  possible witness intimidation and the judge conducted a voir dire outside the presence of the jury. During that proceeding, Rose  admitted  that  portions of her previous testimony had been less than truthful. She also stated that she had been frightened by James  Martin  (the petitioner's brother, who, she said, had pointed at her from the back of the courtroom), by the petitioner's girlfriend,  and by an unidentified woman (who, she said, had given her  dirty  looks,  "scaring [her] from testifying"). Rose went on to recount  that  the  petitioner's girlfriend had signalled her to "come over and talk" outside the courtroom; that the petitioner himself had accosted her shortly after his arrest and instructed her to testify (falsely) that Hinckley had acted alone in expropriating the safe; and that, on another occasion, the Martin brothers ordered her to deny the petitioner's role in the burglary. Based  on  Rose's statements, the court determined that it was  "in  the  interest of justice that the Commonwealth be permitted 4 to reopen and redirect on Miss Rose." In so ruling, the judge witnesses (including Rose) and that the petitioner had been found uilty  of  intimidating Rose. The judge then ordered the courtroom c noted  that  James Martin already had pleaded guilty to intimidating glosed  during  the  remainder of Rose's testimony and refused to make an exception for the petitioner's mother.1 During her reopened testimony, Rose described the petitioner's attempts to intimidate her,  but  her  recollection of the evening in question did not differ materially from her original testimony. III. THE PRISON LITIGATION REFORM ACT We begin with the PLRA, Pub. L. No. 104-134, tit. VIII, 110  Stat.  1321, 1366 (1996), which, among other things, amended 28 U.S.C. S 1915 to require convicts to pay the full amount of the filing  fees  in civil actions. See PLRA, S 804, 110 Stat. at 1373- 1375. The petitioner did not pay a filing fee to the district court and has not paid any other fees associated with the maintenance  of his suit.2 Thus, the threshold question is whether the PLRA applies to habeas petitions brought in federal court by state prisoners. Though  habeas proceedings are technically civil actions, see  Ex  parte  Tom Tong, 108 U.S. 556, 559 (1883), the Supreme Court has long recognized that the label is ill-fitting and that habeas 1Although the closure order exempted the press, there is no evidence  in  the  record  that any reporters were in attendance during Rose's reopened testimony. See Martin, 653 N.E.2d at 605. 2The petitioner did file a motion to proceed in forma pauperis, and although the district court did not grant that motion, he appears eligible for such a dispensation. 5 is  in  fact  a  unique  creature of the law. See Harris v. Nelson, 394 U.S. 286, 293-94 (1969). Here, despite the undiscriminating reference  to  "civil  actions," no fewer than four pieces of evidence indicate  that Congress did not intend the PLRA to intrude into the habeas  realm.   First,  Congress, in enacting the PLRA, took dead aim at suits challenging conditions of confinement, and nothing in either the PLRA's text or its legislative history suggests that habeas cases were perceived to comprise a part of this problem. Second, Congress specifically addressed what it perceived to be habeas  abuses in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, tit. I, 110 Stat. 1216 (1996),  which it enacted contemporaneous with passage of the PLRA, and the abuses it enumerated did not include the non-payment of filing  fees.  See Reyes v. Keane, 90 F.3d 676, 678 (2d Cir. 1996). Third,  extending the PLRA to habeas cases would deny habeas review to any prisoner proceeding in forma pauperis who had previously filed three groundless (though unrelated) civil suits while incarcerated, see 28 U.S.C.A. S 1915(g) (West Supp. 1997), thereby frustrating a storied tradition of reasonable access to habeas review.   See  Martin  v.  Un ited States, 96 F.3d 853, 855-56 (7th Cir. 1996). We seriously doubt that Congress would have purposed to narrow the habeas gateway in so restrictive a manner without some explicit reference to that effect. Last, but not least, this drastic  curtailment  is  largely unnecessary because the AEDPA itself effectively curbs frivolous habeas litigation through limits on successive petitions. See 28 U.S.C.A. S 2244 (West Supp. 1997). 6 We are not alone in finding these indicia persuasive. the circuits that have addressed this question to date hav not apply to habeas petitions. Smith v All e agreed  that  the  PLRA  does See .  Angelone ,  111 F.3d 1126, 1131 (4th Cir. 1997); United States v. Levi ,  111  F.3d 955, 956 (D.C. Cir. 1997) (per curiam); Anderson v. Singletary, 111 F.3d 801, 805 (11th Cir. 1997); United States v. Simmonds, 111 F.3d 737, 743 (10th Cir. 1997); Naddi v. Hill, 106 F.3d 275, 277 (9th Cir. 1997); United States v. Cole, 101 F.3d 1076,  1077  (5th Cir. 1996); Santana v. United States, 98 F.3d 752, 756  (3d  Cir.  1996); Martin, 96 F.3d at 855; Reyes, 90 F.3d at 678. We concur with these courts and endorse their reasoning. Accordingly, we hold that the PLRA does not apply to habeas petitions prosecuted in federal courts by state prisoners. IV. STANDARD OF REVIEW On April 24, 1996 over a month after Martin filed his petition the President signed the AEDPA into law, thereby altering  the  legal framework which governs federal judicial review of habeas corpus applications. See Pub. L. No. 104-132, tit. I, 110  Stat.  1216 (1996). The Supreme Court has now decided that the AEDPA  does  not apply to habeas petitions which were pending at the time the new law took effect. See Lindh v. Murphy, No. 96-6298, 1997 WL 338568, at *8 (U.S. June 23, 1997).3 The petitioner is     3 Prior  to  the  Court's resolution of the question by a five-to- four margin in Lindh, the circuits had divided on the issue of retroactivity. Compare Hunter v. United States, 101 F.3d 1565, 1573 (11th Cir. 1996), cert. denied, 117 S. Ct. 1695 (1997) and Drinkard v. Johnson, 97 F.3d 751, 766 (5th Cir. 1996), cert. denied, 117 S. Ct. 1114 (1997) and Lindh v. Murphy, 96 F.3d 856, 867 (7th Cir. 1996) (all holding that the judicial review 7 therefore entitled to plenary review of his claim that the stat See Dubois , 9 (1st Cir. 1994) (explaining that federal court e court  abridged  his  constitutional rights. Scarpa v. , 38 F.3d 1 s traditionally afford de novo review in respect to habeas petitions brought by state prisoners), cert. denied, 115 S. Ct. 940 (1995); Siegfriedt v. Fair, 982 F.2d 14, 16 (1st Cir. 1992) (similar); Chakouian v. Moran, 975 F.2d 931, 934 (1st Cir. 1992) (similar). V. THE MERITS Refined  to  bare essence, the petitioner's constitutional claim is that his Sixth Amendment right to a public trial was offended by the exclusion of his mother from the courtroom during Rose's reopened testimony. A. This claim rests primarily on the petitioner's interpretation of Waller v. Georgia, 467 U.S. 39 (1984). In Waller,  the  Supreme Court set forth a quadripartite test that must be passed to justify closing a courtroom in a criminal case: [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the provisions  of the AEDPA applied to habeas petitions pending on its effective date) with Jeffries v. Wood, No. 95-99003, 1997 WL 253326, at *11 (9th Cir. May 12, 1997) (en banc) and Burkett v. Love, 89 F.3d 135, 138 (3d Cir. 1996) and Edens v. Hannigan, 87 F.3d  1109,  1112  n.1  (10th Cir. 1996) (all holding to the contrary). We had chosen the former path in an earlier iteration of this opinion. Because Martin's case was still pending before us on a petition for rehearing when Lindh was decided, we withdrew our earlier opinion and now reevaluate Martin's claims under the pre- AEDPA standard. 8 proceeding,  and it must make findings adequate to support the closure. Id.  at  48.   The  petitioner does not challenge the judge's authority to exclude from the courtroom those whose presence actually intimidates  a witness. Rather, emphasizing Waller's second prong, he posits that the exclusion of his mother was broader than necessary to protect the overriding interest of ensuring the integrity of the ongoing trial. We  do  not  agree. Nothing in Waller or in any other case cited  by  the  petitioner  suggests that a trial judge, presented with evidence of repeated attempts at witness intimidation and a live witness who harbors a plausible fear of testifying before spectators known and unknown to her, must undertake an assessment of the exact level of affrightment created by each specific spectator, one by one, before closing a courtroom to the public.4 Rose  already  had  been  frightened and intimidated by the petitioner, the petitioner's brother, the petitioner's girlfriend, and an unidentified woman. The trial court's closure order was neither broader nor longer than was reasonably necessary to end this     4 On  direct review, the Massachusetts Appeals Court summarized the matter as follows: While  we  think the judge should have expressly rather than implicitly determined whether the witness would have had difficulty testifying with the defendant's mother present, it was not  constitutional error requiring a new trial not to do so in the particular circumstances of  recent  intimidation by other family members and persons sympathetic to the defendant. Martin, 653 N.E.2d at 606. We believe that this is a correct synthesis of applicable constitutional principles. 9 widespread reign of harassment and secure the witness's accurate testimony. Our judgment that the trial court's closure order does not run afoul of Waller is buttressed by the Second Circuit's decision  in  W oods v. Kuhlmann, 977 F.2d 74, 78 (2d Cir. 1992). In Woods, a prosecutor informed the judge that one or two members of the defendant's family had visited a witness at her house and warned her not to testify, and the judge then excluded all family members from the courtroom during the witness's testimony. The Woods  defendant  argued,  as does the petitioner here, that the trial court's order swept too broadly. The court of appeals rejected this argument, concurring with the trial judge that "the closure order  was  no  broader than was necessary to enable [the witness] to testify" and that a narrower closure would have been ineffective. Id.  at  77.   In  short,  Woo ds strongly supports the result reached by the district court in this case. B. The petitioner has one last string to his bow. He insists that we should consider the exclusion of his mother from the  courtroom under a "heightened" standard which presumably would be applicable whenever a court excluded a family member from a criminal  defendant's  trial. The short, entirely dispositive answer to this plaint is that the Supreme Court opinion on which the petitioner relies, In re Oliver, 333 U.S. 257 (1948), does not 10 contain any such requirement.5 Nothing in Oliver or, for that matter,  in  Vidal  v.  Willi ams, 31 F.3d 67, 69 (2d Cir. 1994) (noting "a  special  concern  for  assuring the attendance of family members of the accused"), suggests that a trial court need go beyond the already stringent requirements of Waller before removing a defendant's  family members from the courtroom. Those requirements  including  the existence of an overriding interest that is likely to be prejudiced in the absence of closure and that the closure must be no more expansive than necessary to protect that interest adequately safeguard a defendant's interest in permitting his family to be present in the courtroom. In  sum,  we  not only reject the petitioner's assertion of a  heightened  standard for the exclusion of family members from the courtroom, but we also note the exquisite irony of Martin raising the argument where, as here, his relatives played prominent roles in menacing a witness. On these peculiar facts, it seems especially reasonable for the trial court to have concluded that the  witness's founded fears would only be quelled if the courtroom were cleared of spectators associated with those persons who already had threatened her. VII. CONCLUSION We  need  go  no further. Since the PLRA does not apply in the habeas context, Martin's application was properly before the 5Oliver dealt with an entirely secret trial in which the defendant was denied both counsel and proper notice. See Oliver, 333  U.S.  at  258-59. It is altogether dissimilar to this case, and cannot  begin  to  bear  the  load that the petitioner so casually piles upon it. 11 district court notwithstanding his failure to pay a filing fee. Accordingly,  we reach the merits. Once there, however, we discern no constitutional error in the state trial court's decision to close the courtroom during the testimony of Linda Rose. Affirmed. 12