**Ronald TINSLEY, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 00–CF–790, 02–CO–80.**

District of Columbia Court of Appeals.

Argued Sept. 16, 2003.
Decided Feb. 24, 2005.

Gregory A. Cotter, appointed by the court, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and Roger L. Kemp, Assistant United States Attorneys, were on the brief for appellee.

Before SCHWELB and GLICKMAN, Associate Judges, and STEADMAN,* Senior Judge.

PER CURIAM **:

The issue in this appeal is whether Ronald Tinsley's Sixth Amendment right to a

---

* Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on October 18, 2004.

** Associate Judge GLICKMAN is the principal author of the opinion for the court except as to Part III.B.(2). Senior Judge STEADMAN

public trial was infringed upon when the trial judge ordered certain spectators out of the courtroom.[1] The judge excluded the spectators to protect an intimidated prosecution witness and enable her to testify truthfully. We affirm.

## I.

Ronald Tinsley was charged with the fatal stabbing of Carlis Walker on a public sidewalk in the presence of several witnesses. One of those witnesses, Renee Sadler–Wilson ("Sadler"), identified Tinsley to both the police and the grand jury as the person whom she saw punch Walker and then plunge a knife into his chest after Walker refused to buy heroin from him.

Sadler proved to be a reluctant witness, however, when the government sought to elicit her inculpating testimony at Tinsley's trial. Although she answered preliminary questions and acknowledged being present when Tinsley had "some words" with Walker, Sadler became evasive and non-responsive when she was asked to state what she heard and to describe what happened next. "I don't know what you're referring to," Sadler claimed at one point; "I'm not saying. I'm not obligated to say anything," she insisted at another. Confronted with her grand jury testimony, Sadler professed not to remember it. She then flatly refused to answer when the prosecutor asked her whether anything

had happened to cause her to forget what she had said in the grand jury. Repeatedly, Sadler stated that she "didn't want to come in here and testify," "[didn't] want to be involved," "[didn't] want to be here period." The prosecutor asked Sadler whether "anything in this courtroom" was making her "nervous." "Everything in this courtroom is making me nervous," she replied, but added, "I don't feel like talking about it." Sadler remained unresponsive even though she believed she would be "locked up" for failing to answer.[2]

In short, as the trial judge succinctly put it during a bench conference, Sadler "clammed up." Eventually the judge called a ten-minute recess, after observing that Sadler was sitting with her head down and covering part of her face. During this break, Sadler remained in the courtroom. When proceedings resumed, the judge noted on the record that Sadler was crying.

At this juncture, the prosecutor asked for a conference at the bench so that he could report on his exchange with Sadler during the break. The prosecutor had asked Sadler if everything was okay, and in response she "just shook her head and she said, 'The people in the back. That's the problem, the people in the back.'"[3] The prosecutor identified "the people in the back" as Tinsley's brother and his

---

is the principal author of Part III.B.(2), with which Associate Judge SCHWELB concurs.

1. This Sixth Amendment issue is raised in Tinsley's direct appeal from his convictions after a jury trial of second degree murder while armed and carrying a dangerous weapon (a knife). That direct appeal (No. 00–CF–790) has been consolidated with Tinsley's subsequent appeal (No. 02–CO–80) from the trial court's denial of his *pro se* post-conviction motion for a new trial pursuant to D.C.Code § 23–110 (2001). As Tinsley has not briefed any argument in support of his contention that the trial court erred in denying his § 23–

110 motion, electing instead to "submit on the record," we consider him to have abandoned his collateral appeal. *See Bardoff v. United States,* 628 A.2d 86, 90 n. 8 (D.C.1993).

2. Sadler already had been "locked up" twice for not appearing voluntarily in response to the grand jury's subpoenas.

3. The prosecutor went on to explain that he had no further conversation with Sadler during the break. Defense counsel confirmed that fact.

brother's friends.[4] According to the prosecutor, Sadler's "demeanor completely changed when the Defendant's brother walked in the courtroom," and she was "probably even more concerned" by the appearance of his friends. "She thinks that ... the Defendant's brother puts his friends up to do certain things. ... The moment they walked in the courtroom, her eyes became wide and she closed down at that moment. ..." Sadler was fearful, the prosecutor explained, because prior to trial several unknown persons had broken into her apartment, attacked her, stabbed her in the arm, and told her not to testify against Tinsley. Although the perpetrators of the break-in had not been identified, Sadler "said she believed it was the Defendant's brother or his boys." Noting that Tinsley's mother also was attending the trial, the prosecutor added that she too reportedly had threatened Sadler "at one point," although he furnished no details.

Based on the foregoing proffer, the prosecutor requested that "the Defendant's brother and his friends be barred from the courtroom." Tinsley's mother could stay, the prosecutor said, since despite the alleged threat, "she's not going to be a physical danger [to Sadler], I don't think."

Tinsley's counsel opposed the prosecutor's request as unjustified. Defense counsel did not dispute that Sadler had been attacked and threatened prior to trial, and he did not request a *voir dire* of the witness to determine whether she really was intimidated. Counsel argued, rather, that the spectators had behaved appropriately in the courtroom (a fact not in dispute) and that Sadler had not been affected by their entrance and continuing presence. Her demeanor on the witness stand, defense counsel contended, had "remained [the same] throughout." On this latter point, the trial judge disagreed. While the judge could not say that Sadler's "clear ... change of demeanor" was related to the entrance of specific people into the courtroom, the judge found it obvious that the witness became increasingly "hesitant and reluctant" to testify as her examination progressed.

Stating that she "had no intention of excluding anyone from the courtroom unless there were extreme circumstances,"[5] the judge pronounced herself satisfied by the proffer and decided to "exclude [Tinsley's] brother and his associates who have posed a threat."[6] "Based on the proffer," the judge also decided, again over defense objection, to exclude Tinsley's mother. The judge placed no explicit temporal or other limitations on her exclusion of these individuals; specifically, she did not state that they could return to watch the trial after Sadler finished her testimony or at any other time, nor, on the other hand, did

---

4. The trial judge recognized Tinsley's brother as "the large man ... wearing the reddish jacket." A previous witness in the trial had identified Tinsley's brothers when they first entered the courtroom.

5. The trial judge expressed on the record her recognition of the importance of keeping the courtroom open to the public:

 Ordinarily, courtrooms are kept open, and I believe it's important to keep the courtroom open and it should only be done in extreme circumstances. Here, in light of the proffer that this witness has been stabbed in connection with this case and threats made in connection with this case, I believe those are the circumstances that would warrant the exclusion of, quote, unquote, the Defendant's brother's people.

6. Despite the way she phrased her ruling, the judge undoubtedly understood that neither Tinsley's brother nor his brother's associates actually had been identified as Sadler's assailants. The prosecutor's proffer made this perfectly clear.

she state the contrary, i.e. that the exclusion was for the duration of trial.

The record is less than clear as to how the order of exclusion was implemented. It appears that an unidentified courtroom marshal was delegated the task of communicating the order of exclusion to some or all of its intended subjects.[7] No record was made of the identities of the persons associated with Tinsley's brother or of the directions the marshal gave to the spectators in telling them to depart. In particular, the record does not reveal whether the marshal told the spectators that they could return after Sadler left the witness stand. There also is no indication in the record that any of the excluded persons ever did return.

The bar order effectively cleared the courtroom of all spectators except for two court employees. Asked whether she was prepared to continue with her direct examination, Sadler said in a faint voice, "I don't want to be here. No, I don't want to answer no more questions." For a few more minutes the examination proceeded haltingly, with Sadler reiterating her wish to "get out of this courtroom." The prosecutor then observed to Sadler that she had been keeping her head down; "have you looked around the courtroom," he asked her, "since you started testifying?" She confirmed that she had not:

> If I look around the courtroom to see who's here, would it help my testimony? No, it won't help at all. It would make it worse, if anything.

The judge made a suggestion: "Why don't you tell the witness what it is you wish to tell her, Mr. [Prosecutor]? There are two court employees seated in the courtroom." "And only those two court employees, Ms. Sadler," the prosecutor added.

After she realized that the courtroom had been cleared, Sadler became more willing and able to testify.[8] In due course she affirmed that she saw Tinsley stab Walker and that she had identified Tinsley as Walker's assailant to the police.

Sadler also described how she herself had been stabbed in a recent break-in at her apartment. A woman whom Sadler knew as "Tina," the girlfriend of Tinsley's brother, forced open the front door and entered Sadler's apartment with three unknown men. Wielding a knife and declaring that "you're not going to make it to court," Tina attacked Sadler. Sadler received a cut on her face as she fended off the attack. The intruders then fled.[9]

---

7. The trial judge so informed counsel:

 I've told the marshal—I was going to say who was excluded and the marshal just said, "Oh, you mean his brothers." So the marshal has in his mind who the people are who have been coming in together.... the gentlemen who were here earlier other than the [defense] investigator. ... Perhaps [one of the prosecutors] can tell him....

 The record leaves us uncertain, however, whether it was the marshal who implemented the ejection of Tinsley's mother.

8. The prosecutor described Sadler's transformation in his closing argument as follows:

 Renee Sadler—there was a pause, there was a recess. When Renee Sadler resumes, there are only two people, two court employees in the courtroom, and it's brought to her attention that two court employees are in the courtroom. She begins to breathe easier and she begins to be able to testify. She begins to be able to perceive and she tells you, I submit, as credibly as can be, I submit to you, that Ronnie [Tinsley] stabbed that man and that what she said in the grand jury is true.

9. Sadler professed to believe that Tinsley himself had nothing to do with the break-in. In Sadler's view, Tina was "just the type of person that tries to go hard and tries to just take things in her own, you know." The judge instructed the jury that there was no evidence that Tinsley had "made any threats or taken any action against this witness or any other witness, or that he [had] directed anyone to do so on his behalf."

## II.

**■** "In all criminal prosecutions," the Sixth Amendment guarantees that "the accused shall enjoy the right to a ... public trial." U.S. Const. amend. VI. The requirement that criminal trials be open to the public is enshrined in the Sixth Amendment "for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions...." *Waller v. Georgia,* 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (internal quotation marks and citations omitted). "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." *Id.; see also Kleinbart v. United States,* 388 A.2d 878, 881–82 (D.C.1978). Of course, openness serves not merely the interest of the accused in a fair trial but also the interests of the public at large in being informed about the administration of justice. This latter interest too is accorded constitutional standing: "the press and public have a qualified First Amendment right to attend a criminal trial." *Waller,* 467 U.S. at 44, 104 S.Ct. 2210.[10]

**■** The trial in the case now before us was not conducted in total secrecy, of course; the judge did not order the doors to the courtroom to be locked or refuse admittance to the public at large. But, even partial closure of a criminal proceeding may violate the Sixth Amendment guarantee of a public trial. And while the right to be tried in open court certainly "is not trammeled ... by a trivial, inadvertent courtroom closure," *Bowden v. Keane,* 237 F.3d 125, 129 (2d Cir.2001), the presumption is strong that "an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged." *In re Oliver,* 333 U.S. 257, 272, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *accord, Sobin v. United States,* 606 A.2d 1029, 1033 (D.C.1992). Of all members of the public, a criminal defendant's family and friends are the people most likely to be interested in, and concerned about, the defendant's treatment and fate, so it is precisely their attendance at trial that may best serve the purposes of the Sixth Amendment public trial guarantee. Indeed, as was borne out in this case, if family and friends are excluded from the trial, there may be no other members of the public who are interested or concerned enough to attend at all.[11] Thus, if the courtroom closure in this case was not total, it was far from *de minimis.* The exclusion of Tinsley's family members and their associates undeniably threatened to deprive Tinsley of his Sixth Amendment right, regardless of whether his trial was otherwise open to the public.

---

10. *See Press–Enterprise Co. v. Superior Court of Cal.,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986); *Press–Enterprise Co. v. Superior Court of Cal.,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Va.,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).

11. That two court employees remained to watch Tinsley's trial after the exclusion order went into effect was of little value for the protection of his Sixth Amendment right. "For the purposes contemplated by the [public trial] provision of the [C]onstitution, the presence of the officers of the court, men whom [sic], it is safe to say, were under the influence of the court, made the trial no more public than if they too had been excluded." *Oliver,* 333 U.S. at 272 n. 28, 68 S.Ct. 499 (quoting *People v. Hartman,* 103 Cal. 242, 244, 37 P. 153, 154 (1894)).

■ Important as it is, "[t]he right to a public trial is not absolute." *Kleinbart,* 388 A.2d at 882. "However, the qualifications on the breadth of the right are few and are based upon considerations of preserving order, protecting the parties or witnesses, and maintaining confidentiality." *Id.*[12] In view of the fundamental importance of the right to a trial open to the public, these justifications for curtailing that right are not to be invoked lightly; the trial court must find "the strict and inescapable necessity for such a course of action." *Id.* at 883. Thus, as we have said, "it is only under the most exceptional circumstances that limited portions of a criminal trial may be closed even partially to the public." *Id.* at 883. Four criteria must be met to justify excluding the public from a criminal proceeding: "[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure." *Waller,* 467 U.S. at 48, 104 S.Ct. 2210.

■ *Waller* involved the *total* exclusion of the public from just part of a criminal proceeding (specifically, a pretrial evidence suppression hearing). A number of lower federal courts have stated that the first requirement of *Waller*—the existence of an "overriding interest" in favor of closure—"is slightly relaxed where the moving party seeks only a partial closure of the courtroom," such as the exclusion of only a defendant's family members while a single witness is testifying. *Guzman v. Scully,* 80 F.3d 772, 775 (2d Cir.1996). "In those situations," it is suggested, "the moving party need show only a 'substantial reason' rather than an 'overriding interest.'" *Id.* The reasoning is that "a less stringent standard was justified because a partial closure does not implicate the same secrecy and fairness concerns that a total closure does." *Woods v. Kuhlmann,* 977 F.2d 74, 76 (2d Cir.1992). However, we are not persuaded that the distinction between a "substantial reason" and an "overriding interest" is a particularly meaningful one. "After all, a word like 'overriding' is really not a calibrated measure of the gravity of an interest; [rather,] it reflects a conclusion that a particular interest asserted, together with the likelihood of risk to that interest, is sufficient to justify the degree of closure sought." *Ayala v. Speckard,* 131 F.3d 62, 70 (2d Cir.1997) (en banc). There are, moreover, degrees of partial closure, some of which might approach a total closure in practical effect. Thus, we agree with the en banc conclusion of the Second Circuit that "the sensible course is for the trial judge to recognize that open trials are strongly favored, to require persuasive evidence of serious risk to an important interest in ordering any closure, and to realize that the more extensive is the closure requested, the greater must be the gravity of the required interest and the likelihood of risk to that interest." *Id.* We here use the word "overriding" in that nuanced sense.

---

12. We also have upheld the exclusion of vulnerable children from criminal trials for their own protection. *See Sobin,* 606 A.2d at 1033–34 (speaking of the concern to "shield young children from unpleasant discussion of a parent's criminal activity, and ... spare them the sight of a Deputy United States Marshal taking their parent away into custody"). *See* *also McConnaughey v. United States,* 804 A.2d 334, 341–42 (D.C.2002). We emphasized in these cases that all other persons were permitted to attend the trial, and that the exclusion of the children "in no way undermined the public policy goals" of the public trial requirement. *Sobin,* 606 A.2d at 1033.

The *Waller* criteria require the trial judge, in the first instance, to make a number of contextual, fact-specific judgments. Inasmuch as these judgments involve the mid-trial assessment and weighing of competing interests, risks and benefits, and alternative remedies, they are committed to the judge's informed discretion. *See Morgan v. Foretich*, 528 A.2d 425, 427 n. 3 (D.C.1987) (addressing due process right to an open hearing, as to which *Waller* factors apply and a comparable judgment must be made). Accordingly, our review in the present case is for abuse of that discretion. *See, e.g., Sobin*, 606 A.2d at 1033; *United States v. Farmer*, 32 F.3d 369, 371–72 (8th Cir.1994). "However, in light of the constitutional ... right at stake, the trial court's exercise of discretion must be carefully reviewed and supported by specific findings and articulated interests." *Morgan*, 528 A.2d at 427 n. 3. We must focus our scrutiny on whether the judge's discretionary decision to bar certain persons from Tinsley's trial had "a firm factual foundation," *Johnson v. United States*, 398 A.2d 354, 364 (D.C.1979), and was "founded upon correct legal standards," *Benn v. United States*, 801 A.2d 132, 142 (D.C.2002), i.e., the *Waller* criteria.

## III.

### A.

Turning, then, to the criteria by which we must evaluate the exclusion order in this case, we consider first the threshold requirement that "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced." *Waller*, 467 U.S. at 48, 104 S.Ct. 2210. The government contends that two overriding interests supported the trial judge's action: (1) protecting the safety of its witness, Sadler, and (2) enabling her to testify truthfully at trial. There is no doubt that these were the interests that motivated the judge to exclude Tinsley's family members and their associates. The judge relied explicitly on the government's unchallenged proffer that Sadler had been assaulted and threatened, and on her own direct observation that Sadler was virtually petrified on the witness stand.

Past decisions of this court have recognized protection of witnesses and avoidance of intimidation to be overriding interests that may justify the closure of a criminal proceeding. In *Kleinbart*, for instance, we specifically identified "protecting the security of a witness" as an interest "justifying exclusion of some or all of the public from limited portions of trial proceedings." 388 A.2d at 882. More recently, in *McClinton v. United States*, we held it permissible for the trial judge to clear the courtroom temporarily "to avoid [the] intimidation of [a] witness" who was demonstrably frightened by the spectators. 817 A.2d 844, 860 (D.C.2003).[13] Other courts have reached similar conclusions with respect to intimidated witnesses. *See, e.g., Woods*, 977 F.2d at 77 ("[P]rotection of a witness who claims to be frightened as a result of perceived threats meets both the 'substantial reason' and the 'overriding interest' standards."); *United States v. Sherlock*, 962 F.2d 1349, 1356 (9th Cir.1989) (citing cases).

Furthermore, the judge in this case had a sufficient basis in her observations of Sadler and the prosecutor's proffer to conclude, at the least, that Sadler was

---

13. "The trial judge cleared the courtroom during the testimony of a government witness after observing her behavior and concluding that she was 'obviously intimidated by the people in the courtroom.' Upon questioning by the trial judge, the witness asserted that she was 'scared' and that others had advised her to 'take the Fifth [Amendment].' " *Id.*

afraid to testify truthfully in front of Tinsley's family members and their associates. Tinsley argues that the judge would have had a firmer factual foundation for her ruling had she first conducted a hearing and questioned Sadler directly instead of relying on a (rather bare-bones) proffer. We would agree that, in many circumstances and perhaps even ordinarily, a hearing must be held to establish adequate justification for barring the public from a criminal trial over the defendant's objection. *See Guzman v. Scully*, 80 F.3d 772, 775 (2d Cir.1996) (holding that the trial court's partial closure of the courtroom violated the defendant's right to a public trial where "the trial court relied on the unsubstantiated statements of the prosecutor, rather than conducting an inquiry of the prosecution witness on whose behalf the closure request was made"); *cf. United States v. Hernandez*, 608 F.2d 741, 748 (9th Cir.1979) (upholding closure based on government affidavit, but "mak[ing] it absolutely clear that the better course would have been for the trial judge to conduct an evidentiary hearing into the matter"). In the present case, however, three considerations taken together persuade us that the failure to hold a hearing did not invalidate the partial closure order at issue.

First, Sadler's reluctance to testify was palpable and unmistakable. The judge observed it directly and her finding on that score is amply supported by the transcript. Second, Tinsley did not contest the prosecutor's proffer. Had Tinsley sought to inquire of Sadler as to the veracity of the proffer, he would have been entitled to conduct a voir dire of the witness out of the presence of the spectators before the judge could have properly granted the prosecutor's motion. But in the absence of

a voir dire request, the judge had discretion to give credence to a plausible and undisputed proffer by an officer of the court as to what the witness would say. *Mercer v. United States*, 724 A.2d 1176, 1185 n. 5 (D.C.1999) ("[A]n attorney's offer of proof may serve as an adequate foundation" for a trial court's discretionary decision, depending on the circumstances.).[14] Third, Sadler substantiated a key portion of the prosecutor's proffer in her subsequent testimony. Although Sadler was not asked and did not state whether Tinsley's mother had threatened her, and she varied from the proffer in immaterial details (such as the location of her knife wound), Sadler nonetheless confirmed that a friend of Tinsley's brother had stabbed her and told her she would not "make it to court." This testimony, which the defense did not discredit, was enough to explain why Sadler was intimidated by the presence at trial of Tinsley's relatives and their friends. The fact that none of those particular persons may have participated in the attack on Sadler did not make her fear and reluctance to testify in front of them any less reasonable or genuine.

Thus, we are satisfied that the first *Waller* criterion was met here.

### B.

We move on to the second criterion, that an order barring members of the public from the courtroom "must be no broader than necessary" to fulfill its legitimate objectives. 467 U.S. at 48, 104 S.Ct. 2210. Tinsley argues that the order in this case was overly broad in two respects: (1) it excluded too many people, (2) for too long a time. We address each argument in turn.

---

**14.** *Cf. In re Pub. Defender Serv.*, 831 A.2d 890, 905 (D.C.2003) (expressing preference, "as a rule," for more than an unsworn proffer when important interests are at stake, especially when the proffer is ex parte).

(1)

■ Initially, Tinsley complains that the judge excluded spectators indiscriminately. Although he did not request it at the time, Tinsley argues that the judge should have questioned the spectators to determine which of them (if any) actually had played a role in threatening Sadler. We disagree. It is unrealistic to think that such a mid-trial judicial inquisition would have been practical, informative, or sufficient to allay Sadler's anxiety. In similar circumstances, the First Circuit has observed that "[n]othing in *Waller* or in any other case ... suggests that a trial judge, presented with evidence of repeated attempts at witness intimidation and a live witness who harbors a plausible fear of testifying before spectators known and unknown to her, must undertake an assessment of the exact level of affrightment created by each specific spectator, one by one," before ordering the spectators to leave the courtroom. *Martin v. Bissonette*, 118 F.3d 871, 875 (1st Cir.1997). We agree with that statement. We think that by confining her bar order to Tinsley's family and his brother's associates, the trial judge in our case did all that was "reasonably necessary," *id.*, to target only those spectators whose continued presence was truly problematic.[15]

(2)

Tinsley also complains that the spectators were barred for longer than necessary. It is true that, on its face, the trial judge's order was silent as to the duration of the exclusion. She ordered Tinsley's family and friends out of the courtroom without explicitly stating when—or if—they ever could return. But to read this ambiguous order as decreeing exclusion for the duration of the trial would ignore the circumstances under which the order was given. In granting the exclusion, the trial judge was clear that the only reason for closing the courtroom was to protect Sadler and enable her to testify. As she articulated to the parties,

> in light of the proffer that *this witness* has been stabbed in connection with this case, and threat[ened] in connection with this case, I believe that *those are the circumstances* that would warrant the exclusion of "the Defendant's brother's people."

Thus, at the time the order was granted, its purpose was clear—to secure *Sadler's* testimony free from the intimidation of certain persons in the courtroom. This was plainly known to all involved; trial judge, the parties, and counsel for both sides. At no point did the trial judge, nor either of the parties, give any indication that the exclusion was intended to last beyond its evident purpose.[16] While am-

15. Tinsley also takes special exception to the ejection of his mother, which he characterizes as "an act of substantial insensitivity." "By all accounts," Tinsley states, "she was merely an old lady sitting in the courtroom watching her son being tried for murder." But that assertion is not entirely accurate, for the prosecutor's proffer was that even Tinsley's mother had communicated a threat to Sadler. Had the proffer been discredited, it is doubtful that exclusion of Tinsley's mother would have been justified. *Cf. Martin*, 118 F.3d at 875 (upholding exclusion of defendant's mother in light of harassment of witness by other family members); *Woods*, 977 F.2d at 77 (same). But as the record stands, we think that the judge did not abuse her discretion in relying on the unchallenged proffer, even though it lacked specifics, to make Tinsley's mother subject to the bar order.

16. The only possible extension suggested by the discourse would flow from the prosecution's brief expression of concern about intimidation of Sammie Smalls, who had previously testified. Smalls was recalled and briefly testified the same afternoon after Sadler and two other pro forma government witnesses had testified.

biguous on its face, viewed in the context in which it was given, it is apparent that the order was intended to last only for the duration of Sadler's testimony.

Despite the context in which it was given, Tinsley suggests that the order "appears to have been in effect for the remainder of the trial." There is no evidence that this was the case, however. Tinsley has not identified any person who was denied readmission after Sadler's testimony concluded. Nor did he object to the alleged overbreadth of the exclusion at trial. This is not surprising; in light of the context in which it occurred, Tinsley's silence is reflective of a logical construction of the order, that it was to endure for the duration of Sadler's testimony. Had Tinsely understood the exclusion order to mean something broader, contrary to his Sixth Amendment interests, the natural course would have been to object, or ask the trial judge for clarification. This he did not do. Given the background of the order and the trial judge's explicit recognition of the sensitivity of the issue, we have no doubt that she would have expressly limited the duration of the order had such a clarification been requested. In the absence of any action by trial counsel, we are particularly constrained not to find reversible error here, where the Sixth Amendment interest at stake is not that of the general public, but rather that personal to appellant. The trial continued for two days after Sadler's testimony, including the entire defense case, and there was thus ample opportunity to object to any undue length of the exclusion order.

Absent any evidence that the exclusion was in fact applied more broadly than the circumstances suggest, with the knowledge and acquiescence of the trial judge over appellant's objection,[17] we can not accept Tinsley's construction of the order. *Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C.1982) ("[I]t is appellant's duty to present this court with a record sufficient to show affirmatively that error occurred."). Accordingly, viewing the order in light of the circumstances in which it was imposed, we conclude that the exclusion of Tinsely's family members during Sadler's testimony was "no broader than necessary" to achieve its legitimate purpose. *See, e.g., McClinton,* 817 A.2d at 860 (finding no Sixth Amendment violation where the courtroom was closed during the testimony of the intimidated witness); *Bell,* 236 F.3d at 168 ("Because the compelling interest for closing the courtroom was the protection of [a witness] during her testimony, limiting the closure to her testimony was ... tailored to serve that interest."); *Woods,* 977 F.2d at 77 ("[T]he closure order was no broader than was necessary to enable [the witness] to testify, while otherwise allowing the public to attend the trial if it chose to do so.").

### C.

*Waller*'s third requirement is that "the trial court must consider reasonable alternatives to closing the proceeding." 467 U.S. at 48, 104 S.Ct. 2210. In the present case the trial judge expressly viewed even a partial closure of the courtroom as a last resort, to be employed only in extreme circumstances. Although the judge did not give explicit consideration to alternatives, neither party identified or asked the judge to weigh other options. Now, however, on appeal, Tinsley argues that a number of reasonable options did exist. For one, he suggests that the prosecution

---

17. If the marshal in executing the order overstated its duration in speaking to the affected family members and associates, appellant could fairly be expected to monitor and learn of the marshal's overstatement.

could have been required to forego Sadler's live testimony altogether and rely solely on her grand jury testimony (some of which was, in fact, introduced during Sadler's examination). Or, Tinsley now proposes, the trial could have been interrupted to permit the remainder of Sadler's testimony to be videotaped outside the presence of the jury. The videotape then could have been played to the jury in lieu of Sadler's live testimony, allowing Tinsley's relatives and friends to be present. A third possibility Tinsley offers is that the judge could have explained Sadler's concerns to the "offending" spectators in the hope that "some or all of them would have agreed to remain outside" for the remainder of the witness's testimony. "If not," Tinsley goes on to explain, "the trial court could have considered allowing one or two of them to remain, with the rest being excluded, and with the affected parties deciding who would wait outside." Lastly, Tinsley suggests that the judge might have discussed with Sadler the importance of a defendant's Sixth Amendment right to a public trial and persuaded her to "put aside" her concerns out of respect for that right.

The government argues that we "cannot presume that the trial judge failed to consider any alternatives to the one proposed by the [government] simply because [she] did not discuss others in open court." *Bell,* 236 F.3d at 169. Perhaps not; but given the fourth requirement of *Waller* that the trial court must make findings adequate to support a closure of the courtroom, we do not think it appropriate to reject Tinsley's argument on that sole ground. The government also argues that *Waller* does not oblige a trial judge to consider alternatives *sua sponte,* at least

so long as "only" a nominally partial closure of the courtroom is in issue. *See, e.g., Ayala,* 131 F.3d at 71–72 ("At that point, it becomes the obligation of the party objecting to the trial court's proposal to urge consideration of any further alternatives that might avoid the need for even a limited closure.").[18] Given the allocation of responsibilities in the courtroom during a trial, and the multitude of duties that the judge must shoulder, there is much force to this argument. The judge is not obliged to invent novel alternatives out of thin air, nor to bring up dubious options that the parties themselves have not ventured to propose, only subsequently to reject them. Nonetheless, we are not so sure that a trial judge should be absolved from considering even the most obvious reasonable alternatives to exclusion of the public that may be available merely because the parties have failed to propose them. To take that position would be to slight the independent public interest in an open courtroom.

We need not ponder further the duty of the trial judge *sua sponte* to consider reasonable alternatives to closure. So far as we can tell, no such alternatives existed in this case. Although Tinsley suggests a few options, none of them strikes us as reasonable. Excusing Sadler and making do with her transcribed testimony before the grand jury would have hobbled both the prosecution and the defense and would have impaired the jury's ability to evaluate the witness's testimony in light of her demeanor. Videotaping Sadler's testimony, even if it were practical (which we doubt), would not have alleviated her trepidation, since she would have known that the people she feared would be able to watch the tape. That the judge could have conferred

---

**18.** "Of course," the Second Circuit was careful to add, "if some further alternative is suggested by the defendant or the prosecu-

tion, the trial judge should give it consideration." *Ayala,* 131 F.3d at 72.

with the spectators about Sadler's concerns and invited them to leave the courtroom voluntarily (or excluded only some of them) would not have been an alternative to exclusion but rather a way of narrowing it, a subject we have already addressed; in any event, advising the spectators that Sadler was afraid of them would not have been fair to Sadler, nor would it have been an appropriate way to allay her fears. *See Woods,* 977 F.2d at 77 ("Woods' contention that the trial judge could have simply admonished the defendant's family, while arguably an alternative, hardly seems a reasonable one in light of the prosecutor's statement that [the witness] was 'scared to death' to testify and had 'clammed up' at the mere sight of defendant's family."). Finally, it is unrealistic to suggest that the trial judge should have tried to persuade Sadler to appreciate that Tinsley's right to a public trial obliged her to set aside her anxieties and testify freely. Sadler was a witness, after all, who was so distraught and terrified that she preferred to be sent to jail rather than testify against Tinsley in front of his brother and his brother's friends.

### D.

 *Waller*'s final requirement is that the trial judge "must make findings adequate to support the closure." 467 U.S. at 48, 104 S.Ct. 2210. "In light of the important interests at stake, the trial judge should always provide a statement of reasons for excluding particular persons from the courtroom, especially in the face of a defense objection. When that is done, the parties will better understand the court's decision, and a record will be made

for appellate review." *Sobin,* 606 A.2d at 1034 n. 6. Although the trial judge in the present case "did not give a lengthy articulation of her reasons," *id.* at 1034, a lengthy articulation is not always necessary. The judge's stated reasons are to be evaluated in light of the entire record and by reference to the scope of the closure that they support. *See Bell,* 236 F.3d at 172–73.[19] Here the judge expressly relied on her own observation that Sadler was demonstrably intimidated and on the unchallenged (and subsequently corroborated) proffer linking Sadler's intimidation to the people whom the judge decided to exclude. As we already have explained, the judge's reasons were sufficient to justify the partial closure of the courtroom that the judge ordered, except that they did not justify the continuation of that closure after Sadler finished testifying. The judge having "made a particularized determination that closure [was] appropriate and [having] articulated the basic rationale ..., additional 'findings' would [have been] little more than a statement of the obvious." *Bell,* 236 F.3d at 172.

### IV.

For the foregoing reasons, the judgment of conviction is *Affirmed.*

GLICKMAN, Associate Judge, concurring in part and dissenting in part.

I disagree with Part III.B.(2) of the court's opinion and, consequently, with my colleagues' resolution of this appeal. The Sixth Amendment requires that any exclusion of members of the public from a criminal trial "must be no broader than neces-

---

**19.** "[T]he *Waller* Court prescribed no particular format to which a trial judge must adhere to satisfy the findings requirement, and we read nothing in *Waller* that would require a reviewing court to evaluate the trial judge's closure order solely on the basis of the explic- it factual findings and, thereby, ignore facts of record which fully support the decision and belie a claim that [the defendant's] right to a public trial was actually violated by the closure." *Bell,* 236 F.3d at 172.

sary" to fulfill its legitimate objectives. *Waller v. Georgia,* 467 U.S. 39, 48, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). The exclusion order in this case violated that requirement. The sole justification for closing the courtroom was to enable the intimidated witness, Sadler, to testify.[1] To comport with the Sixth Amendment, the exclusion order therefore should have expired when Sadler finished testifying. *See, e.g., McClinton v. United States,* 817 A.2d 844, 860 (D.C.2003); *Bell v. Jarvis,* 236 F.3d 149, 168 (4th Cir.2000) (en banc); *Woods v. Kuhlmann,* 977 F.2d 74, 77 (2d Cir.1992). Instead, the order was open-ended; by not setting any limit, the trial judge unjustifiably ordered Tinsley's family members and their associates out of the courtroom for the rest of the trial.

My colleagues agree that any exclusion of spectators should have been limited to the period of time during which Sadler was on the witness stand, and they are prepared to concede that the duration of the exclusion order was (at least) "ambiguous." *Ante* at 877, 878. Nonetheless, my colleagues deem it "apparent that the order was intended to last only for the duration of Sadler's testimony." *Ante* at 878. I do not agree that we can so divine the trial judge's unspoken intent. It is puzzling, if the trial judge truly intended the exclusion of the spectators to be temporary, that she did not so state. It is wishful thinking to infer that because the rationale expressed by the judge during the bench conference

did not support her formal ruling, she did not mean to rule as she did. Notably, the government makes no such claim.

More important than what the trial judge intended, however, is what she actually did. With all due respect to my colleagues, her exclusion order was not "ambiguous on its face." *Ante* at 877–78. The record shows that the judge expelled Tinsley's family and friends unconditionally. She did not state that the spectators could reenter the courtroom following Sadler's stint on the stand, nor did she explain to them why they were being removed. My colleagues overstate the case when they argue that the limited purpose of the exclusion order "was plainly known to all involved." *Ante* at 877. The subjects of the order—the spectators—were not present at the bench conference. So far as the record indicates, they did not know why they were ejected and had no reason to think they could soon, or ever, return. Although Tinsley asserts only his own Sixth Amendment right to a public trial and not also the spectators' own First Amendment right to attend the trial, both constitutional rights were violated by an order that expelled the public without notice that expulsion was only temporary. Furthermore, even if Tinsley and his defense counsel were aware of the underlying justification for the exclusion order, that does not mean they necessarily understood the order to be narrowly tailored in accordance with its rationale. Tinsley and

---

1. None of the spectators disrupted the trial or otherwise engaged in misconduct during the proceeding. Thus their exclusion was not necessary to maintain order and decorum in the courtroom. *Cf. Zeledon v. United States,* 770 A.2d 972, 978 (D.C.2001) (finding no plain error in the exclusion of family members who carried signs urging that the defendant be acquitted). Further, none of the spectators was identified as having participated in the attack on Sadler. (I do not overlook the prosecutor's proffer that Tinsley's mother

had threatened Sadler. The prosecutor did not disclose the circumstances of the alleged threat and did not view the incident as being serious enough to warrant the mother's removal. It is not contended that this allegation warranted the mother's total exclusion. As a general matter, though, I would think that a spectator who actually has threatened a witness reasonably could be excluded from the entire trial and not just while the particular threatened witness is on the stand.)

his counsel reasonably could have inferred that the judge meant to eliminate entirely the potentially poisonous presence in the courtroom of persons whose appearance had caused at least one witness to be fearful and who were suspected of having engaged in witness intimidation. The record thus affords us no reason to think that the spectators or anyone else in the courtroom interpreted the exclusion to expire when Sadler finished testifying.

Further, there is no evidence that the excluded spectators ever were allowed back into the courtroom. The government argues that because it is Tinsley's burden "to present this court with a record sufficient to show affirmatively that error occurred," *Cobb v. Standard Drug Co.*, 453 A.2d 110, 111 (D.C.1982), we "may not reverse based upon speculation that [Tinsley's] family was excluded" from the balance of the trial after Sadler's examination ended. However, in the absence of any evidence to the contrary, the presumption surely is that the judge's order was obeyed according to its terms. It would be "speculation" to presume otherwise. Tinsley therefore has shouldered his burden of presenting us with a record that affirmatively shows error, and the burden has shifted to the government to show that what the judge erroneously ordered did not, in fact, occur.

The government's only effort to carry this burden is its argument that since "de-

fense counsel did not request that appellant's family members have an opportunity to watch the defense case or the closing arguments, it is entirely possible that they were, in fact, readmitted to the courtroom." This conjectural possibility hardly serves to demonstrate that Tinsley's family members in fact were allowed back into the courtroom to watch the remainder of the trial.[2] From the fact that no one—not the prosecutor, nor the defense counsel, nor the judge—noted the reappearance of the excluded spectators, it is more natural to infer that none of them came back. For example, had Tinsley's mother sought to return after Sadler left the stand, counsel most likely would have requested permission from the judge for her to reenter the courtroom, given that the judge had placed no temporal limit on her exclusion.

While Tinsley objected to the expulsion order in its entirety, my colleagues fault him for not objecting specifically to "the alleged overbreadth of the exclusion at trial." *Ante* at 878. As a matter of law, however, this omission did not constitute a waiver of the objection. Rather, the only possible legal significance of the omission is that, on appeal, the specific "overbreadth" argument might be subject to the rigors of "plain error" review. *See Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).[3] My colleagues do not invoke the plain error rule or evaluate Tinsley's claim according to its strictures, however; nor does the

2. Among other things, both the government and my colleagues ignore the fact that when the spectators were expelled without being informed that they could return, they had no reason to remain indefinitely in the vicinity of the courtroom. Instead, it is "entirely possible" (to quote the government; I would say it is probable) that they simply left the courthouse. If this is indeed what happened, defense counsel would not have been in a position to request that they be readmitted to observe the balance of the trial.

3. Under Superior Court Criminal Rule 52(b), as under its federal counterpart, "before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights.... If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 466–67, 117 S.Ct. 1544.

government contend that Tinsley forfeited his "overbreadth" objection and must show plain error to prevail on it.[4]

There is good reason not to invoke the plain error standard of review in this case. This court does not "apply plain error review in a rigid fashion which elevates form over the practical dynamics of trial litigation." *Brown v. United States*, 726 A.2d 149, 154 (D.C.1999). We appreciate that "difficult questions may ... arise at trial with little warning, and ... trial counsel (and indeed, the judge) may be 'understandably taken off guard by a completely unexpected denouement.'" *Salmon v. United States*, 719 A.2d 949, 953 (D.C. 1997) (citations omitted). When that happens, our cases do not hold counsel to unrealistic standards of precision. Rather, we treat a claim as preserved for appeal so long as the judge is "fairly apprised as to the question on which [she] is being asked to rule." *Id.* (internal quotation marks and citations omitted); *see also Hunter v. United States*, 606 A.2d 139, 144 (D.C. 1992). Moreover, "once a ... claim is properly presented [to the trial court], a party can make any argument [in the appellate court] in support of that claim; parties are not limited to the precise arguments made below." *Yee v. Escondido*, 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992); *see, e.g., Stancil v. United States*, 866 A.2d 799, 805 (D.C.App. 2005); *West v. United States*, 710 A.2d 866, 868 n. 3 (D.C.1998).

As my colleagues and the government implicitly concede, these principles preclude application of a plain error review standard here. Issues concerning the Sixth Amendment right to a public trial seldom arise at all, and here those issues arose in the midst of trial with no warning. It would be unreasonable to expect defense counsel in such a situation to have at his fingertips the particular criteria that the Supreme Court enunciated in *Waller*. It is enough that Tinsley objected and put the trial judge (and the prosecutor) on notice of his basic claim that the order of exclusion was not justified. The record confirms that the judge was well aware of the legal issue before her, because she acknowledged that "extreme circumstances" had to exist to justify any exclusion. Given that express acknowledgment, it is perfectly fair to view the judge as being on notice that any order of exclusion must be no broader than the circumstances justified. My colleagues admit as much when they confidently (though, in my view, mistakenly) opine that the judge intended her order to be of limited duration. *Cf. Stancil*, at 804–05. ("In this case, as in *Chatmon v. United States*, 801 A.2d 92, 100 (D.C.2002), the appellant 'benefits from the supervision of the trial by an attentive trial judge,' who recognized the existence of a significant issue....."). Thus, although Tinsley did not argue to the trial judge specifically that the unlimited duration of the order of exclusion was broader than necessary, he is entitled under *Yee, Stancil* and *West* to present that

---

4. Rather, the government agrees that our review in this case is for abuse of discretion. When the government has not argued for it, we have declined to apply the plain error standard of review *sua sponte*. *See In re T.L.*, 859 A.2d 1087, 1090–91 n. 6 (D.C.2004); *Medrano–Quiroz v. United States*, 705 A.2d 642, 648–49 (D.C.1997); *see also Rose v. United States*, 629 A.2d 526, 537 (D.C.1993). Courts of appeals "consistently" have held that "when [the government] has neglected to argue on appeal that a defendant has failed to preserve a given argument in the [trial] court ... the government has 'waived waiver.'" *United States v. Quiroz*, 22 F.3d 489, 491 (2d Cir.1994) (citing cases); *see, e.g., United States v. Fields*, 371 F.3d 910, 916 n. 3 (7th Cir. 2004); *United States v. Beckham*, 296 U.S.App. D.C. 311, 318 n. 5, 968 F.2d 47, 54 n. 5 (1992).

argument on appeal in support of his basic claim, which is unquestionably preserved.

As Tinsley's objection to the duration of the courtroom closure is preserved, we must determine the relief to which he is entitled on account of the unconstitutional exclusion order. There can be no argument that the unjustified courtroom closure in this case was *de minimis* or trivial. So far as appears, it encompassed part of the prosecution case, the entire defense case, jury instructions, and closing arguments. A substantial portion of Tinsley's trial was not open to the public. That is not a technicality; even if unintentional, it is a grievous departure from a fundamental principle of the administration of justice. It is not something we should dismiss as unimportant or harmless. "The violation of the constitutional right to a public trial is a structural error, not subject to harmless error analysis." *Bell*, 236 F.3d at 165; *see Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Therefore, Tinsley is not required to show prejudice in order to be entitled to a new trial. *Kleinbart v. United States*, 388 A.2d 878, 882 (D.C. 1978); *Waller*, 467 U.S. at 49–50, 104 S.Ct. 2210. The constitutional deprivation is "per se reversible." *Kleinbart, supra.*

That said, I note that there is a potentially significant gap in the record regarding the implementation of the order of ejection. The order evidently was communicated to at least some of the spectators by the courtroom marshal rather than by the judge herself. This communication was accomplished off the record. Although it may be presumed that the marshal faithfully transmitted the judge's order, the fact remains that the trial transcript does not disclose whether the marshal informed the spectators that they could return after Sadler finished testifying. I do not regard it as wholly implausible that the marshal might have done so. Moreover, as the government argues, the record does not conclusively exclude all possibility that the ejected spectators eventually did return to the courtroom (or understood, somehow, that they could return) after Sadler finished testifying. This is a consequence, perhaps, of the fact that no one focused on the question during the trial. In light of the residual uncertainties, I think that immediate reversal of Tinsley's convictions would be premature. Instead, it would be appropriate to give the government an opportunity to prove, if it can, that the spectators ejected from Tinsley's trial actually were allowed to return following Sadler's examination. *Cf. United States v. Doe*, 63 F.3d 121, 131 (2d Cir.1995) (remanding in light of "the sparseness of the record" for the trial court to make factual findings respecting its closure order); *Stancil, supra* (remanding the record for trial court to make findings on whether out-of-court statements admitted against defendant were "testimonial").

Accordingly, I would remand the record for the judge to hold a hearing to determine what the spectators actually were told regarding the duration of their exclusion. Unless the spectators were excluded only while the intimidated witness was still on the stand, Tinsley should receive a new trial.